AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>Hernan Dario Burgos Prada<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 1:25-mj-181<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __Feb. 20, 2025 to Feb. 28, 2025__ in the county of __Hamilton__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §1956(h) and<br>18 U.S.C. § 1956(a)(3)(B) | Conspiracy to Commit Money Laundering and Attempted Money Laundering; |
| 21 U.S.C. § 959(a), 963 and<br>960(b)(3) | Conspiracy to Distribute Cocaine, knowing, intending or having reasonable cause to believe that it would be unlawfully imported into the United States. |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

JACOB FORRESTER
Digitally signed by JACOB FORRESTER
Date: 2025.02.28 17:29:29 -05'00'

*Complainant's signature*

SA Jacob Forrester, DEA
*Printed name and title*

Sworn to before me and signed in my presence.
**via FaceTime video**

Date: __Feb 28, 2025__

_Karen L. Litkovitz_
Karen L. Litkovitz
United States Magistrate Judge

City and state: __Cincinnati, Ohio__

# AFFIDAVIT IN SUPPORT OF A
# CRIMINAL COMPLAINT AND ARREST WARRANT

I, SA Jacob Forrester, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. This affidavit is made in support of a criminal complaint to arrest and charge Hernan Dario BURGOS PRADA with: (1) conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(3)(B); (2) attempted money laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(B); and (3) conspiracy to distribute cocaine, knowing, intending or having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 963, and 960(b)(3).

2. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA) and have been since April 2022. I am currently assigned to the Detroit Field Division, Cincinnati District Office ("CDO"). I have received specialized training from the DEA, including a 17-week Basic Agent Training course at the DEA Academy in Quantico, Virginia from January-April 2022. This training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug violations.

   a. As a DEA Agent, I have participated in all aspects of drug investigations, including physical surveillance, installation and monitoring of GPS devices, execution of search warrants, arrests of drug traffickers, and Title-III wiretap investigations. I have participated in the execution of numerous search warrants seeking evidence of violations of the Federal Controlled Substances Act (Title 21 of the United States Code). These warrants covered the search of locations such as residences of drug traffickers and their co-conspirators/associates, drug manufacturing operations, and

stash houses used as storage and distribution points for controlled substances. I have also participated in the execution of search warrants for electronic devices and information, such as search warrants for e-mail accounts, mobile telephones, and GPS tracking devices.

b. By virtue of my involvement in these investigations, I have become familiar with the various means and mechanisms used by drug traffickers to import and distribute controlled substances and to remain at large without being detected by law enforcement. I am familiar with the fact that drug traffickers make tremendous profits through drug trafficking and require large amounts of currency to operate surreptitiously. In this regard, I have obtained and executed numerous search warrants in which I have seized ledgers, notebooks, papers, and other related record-keeping instruments, all of which have been used to record multiple narcotics and related money laundering transactions. I have also seized telephone books, diaries, invoices, cellular telephones, and correspondence that contained evidence of narcotic trafficking and money laundering violations.

c. I have been involved in interviewing individuals post-arrest, defendants in conjunction with post-arrest proffers, confidential informants, and other non-defendant individuals with knowledge of illegal drug trafficking. During such interviews and through discussions with other experienced agents, I have become familiar with the day-to-day operations of distributors and transporters of controlled substances. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of their criminal activities. This includes information about the packaging and preparation of narcotics, methods in which illicit drugs are smuggled, transported, and distributed, and security measures commonly employed by narcotics traffickers. These security measures include the use of firearms to protect their narcotics-related activities, and the use of cellular telephones, pagers, and personal digital assistants to facilitate communications while attempting to avoid law enforcement scrutiny.

d. As a result of my participation in these and other activities, I have gained particular knowledge in the use of confidential informants, physical surveillance, consensual recordings, investigative interviews, garbage searches, pole-mounted cameras, and GPS tracking devices. Based on my training and experience, GPS tracking devices aid law enforcement in the investigation and detection of illegal drug trafficking by enabling agents to analyze the suspected trafficker's travel patterns. GPS data can aid law enforcement in identifying co-conspirators as well as stash houses, which are residences where contraband and instrumentalities of drug trafficking, such as firearms and drug paraphernalia, are stored.

e. In addition to using these and other investigative techniques, I have analyzed information from traditional record sources, such as financial records, utility records, and telephone toll and subscriber records. I have also analyzed nontraditional record sources such as the informal ledgers routinely maintained by narcotics traffickers. These informal ledgers, commonly referred to as pay-owe sheets, list amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources. I have also gained experience in the identification and collection of drug and non-drug evidence, and the analysis and interpretation of taped conversations obtained by the methods detailed above.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, and witnesses. This affidavit is submitted for the limited purpose of demonstrating probable cause for the issuance of a criminal complaint and arrest warrant, and thus does not contain each and every fact that I know about the investigation.

## PROBABLE CAUSE

4. On November 13, 2024, a DEA Confidential Source ("CS1") met in Bogota, Colombia with two Colombian drug traffickers (Co-Conspirator #1 ("CC1") and Co-Conspirator #2 ("CC2")) to arrange for the purchase of six kilograms of cocaine.[1] CC1 and CC2 agreed to sell the cocaine, and – with CS1 – arranged for the cocaine to be delivered to associates of CS1 in Bucaramanga, Colombia. During the course of arranging this cocaine transaction, CS1 made clear to CC1 and CC2 that the cocaine was destined for importation to the United States. That same day, an unknown male delivered the cocaine in Bucaramanga, Colombia to undercover law enforcement agents who presented themselves as members of CS1's drug trafficking organization. The cocaine was field tested and confirmed to be cocaine. CS1 maintained communication with the DTO members with the intention of conducting an additional cocaine purchase in the future.

5. On February 13, 2025, CS1 met with CC1 in Bogota, Colombia. Prior to that meeting, CS1 and CC1 had arranged for another cocaine deal. CC1 and his group would provide 24 kilograms of cocaine to CS1 and his/her associates, and CS1 would pay CC1 for the cocaine.

---

[1] [redacted]

CS1 informed CC1 and/or his associates that the cocaine was destined for importation to the United States (Cincinnati, Ohio). On February 13, 2025, the 24 kilograms of cocaine were delivered to undercover law enforcement officers in Medellin, Colombia, by CC2. Those undercover officers presented themselves as members of CS1's drug trafficking organization. The cocaine was field tested and confirmed to be cocaine. However, CS1 did not pay for the cocaine that day. Instead, CS1 maintained communication with the targets and stated that payment would be made in Cincinnati, Ohio.

6. Following the operation, CS1 communicated with CC1 and CC2 to arrange the payment for the cocaine. Through conversations with CC1 and CC2, CS1 learned that CC1's father, Co-Conspirator #3 ("CC3") claimed to be the owner of fifteen of the kilograms that had been delivered. CS1, CC3, CC1, and CC2 all discussed how CS1 could provide payment for the cocaine that CS1 explained was being sold in Cincinnati, Ohio. To effectuate that payment, CC1 provided CS1 with a telephone number for alias Renel SIAVATO who was later identified as Hernan Dario BURGOS PRADA. BURGOS PRADA is a Colombian money launderer.

7. In late February 2025, CS1 participated in a group call with CC3, CC1, CC2, and BURGOS PRADA regarding the payment for the cocaine received. During the conversation, BURGOS PRADA agreed to accept the money laundering contract in Cincinnati, OH on behalf of CC3, CC1, and CC2. BURGOS PRADA informed CS1 that he would send one of his employees to pick-up the money and further advised that they had an "office" in Cincinnati. Based on my training and experience, I know that a money laundering "office" is a group or an employee who will pick up drug proceeds and launder the money back to the source. BURGOS PRADA advised CS1 that he would pass a token the day before the agreed upon date.

8. Moreover, during the above referenced group call, CS1 advised the payment would be a total of $404,444. CS1 specified, $204,444 would be the payment and proceeds derived from

4

the sale of the kilograms of cocaine sold in Cincinnati on behalf of CC3 and CC1. CS1 indicated the additional $200,000 would be downpayment for a future cocaine load where the purity rate would need be at ninety percent.

9. On February 27, 2025, instead of sending an employee as previously mentioned, BURGOS PRADA traveled to Cincinnati, OH, via United Airlines. CS1 met with BURGOS PRADA and discussed cocaine trafficking and BURGOS PRADA's money laundering activities. BURGOS PRADA told CS1 he had conducted money laundering operations for a while, and added he had money laundering operations in Chicago, Los Angeles, and Miami. BURGOS PRADA offered to supply CS1 with the drug 2CB if the materials would be provided and that a kilogram would cost approximately $100,000 per kilogram. BURGOS PRADA agreed to meet with CS1 the following day to collect a total of $404,444, and the parties discussed the fact that the money came from cocaine trafficking proceeds.

10. On February 28, 2025, CS1 coordinated a meeting at a hotel located in West Chester Township, OH. A DEA Special Agent acting in an undercover capacity (the "UC") accompanied CS1 to the hotel and was present during the money laundering negotiations. During the meeting, CS1 contacted CC1 via phone in the presence of BURGOS PRADA and a ledger was produced which showed the money laundering amounts for the cocaine transactions to total $404,444.00. CS1 and BURGOS PRADA discussed that this was payment for the cocaine previously provided in Colombia, and also a down payment for an additional load of cocaine to be provided in Colombia for importation to the United States. CS1, the UC, and BURGOS PRADA exited the hotel and walked to a UC vehicle in the parking lot. CS1 opened a suitcase and displayed a purported bulk currency amount which appeared to be $404,444.00 contained inside a black roller suitcase. This was presented as payment for the prior cocaine deal in Colombia (and the

downpayment for the future cocaine deal). BURGOS PRADA took possession of the purported bulk U.S. currency and contacted an Uber to depart the area.

11. BURGOS PRADA entered an Uber and traveled I-75 North until the vehicle was stopped by local law enforcement. BURGOS PRADA agreed to speak with law enforcement. BURGOS PRADA was transported to the DEA Cincinnati District Office. BURGOS PRADA was advised his *Miranda* Rights and advised he understood. BURGOS PRADA admitted to traveling to Cincinnati to collect the proceeds of the aforementioned cocaine transactions on behalf of CC1. BURGOS PRADA would then facilitate the transfer of the bulk US currency back to Colombia. BURGOS PRADA advised he was going to transfer the currency via crypto wallet back to "Mario" or "Andres". BURGOS PRADA was advised by CC1 that he would receive approximately $4,000.00 commission for the laundering operation. BURGOS PRADA also explained that he knew that part of the payment was a down-payment for a new load of cocaine, which would be provided in Colombia by the DTO and transported to the United States. This was planned to include 70 kilograms of cocaine.

Respectfully submitted,

**JACOB FORRESTER**
Digitally signed by JACOB FORRESTER
Date: 2025.02.28 17:30:40 -05

Jacob Forrester
DEA Special Agent

Subscribed and Sworn to Before me this __28__ day of
February, 2025, via FaceTime

Karen L. Litkovitz
United States Magistrate Judge

6